**Kathleen Shetler GLOBUS, Plaintiff,**

**v.**

**Samuel SKINNER, Secretary, Department of Transportation, Defendant.**

Civ. A. No. 85–1582.

United States District Court, District of Columbia.

Sept. 12, 1989.

See also 704 F.Supp. 267.

Philip R. Kete, Gaffney, Schember & Kete, Washington, D.C., for plaintiff.

Daniel Bensing, Asst. U.S. Atty., Washington, D.C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

REVERCOMB, District Judge.

This case involves an allegation of unlawful retaliation against an employee for her antidiscrimination activities, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3(a). Trial was held on April 6–11, 1989. In the findings of fact, the Court concludes that the defendant did not retaliate against the plaintiff and in the conclusions of law the Court finds in favor of the defendant.

### I. Findings of Fact

The plaintiff, Kathleen Shetler Globus ("Ms. Shetler")[1], was hired in 1967 by the Maritime Administration (MarAd), an agency of the United States government.[2] She was promoted numerous times, achieving the grade of GS–13 in 1973. In 1977, Ms. Shetler was assigned to a position in the Office of Maritime Labor and Training, which was referred to as "Code 250." The head of the office was Mr. Arthur Friedberg.

During the 1970s and early 1980s, Ms. Shetler was involved in a number of equal employment opportunity ("EEO") activities at MarAd. She received from the Secretary of Commerce in 1979 a certificate in recognition for her EEO work.

One of these activities was a class action lawsuit, *Harrison v. Dole*, brought in 1977 by MarAd employees, alleging discrimination on account of sex and race. Ms. Shetler was deposed in June 1981 and was listed by the plaintiffs in October 1981 as a potential witness. She she did not, however, testify at the trial in February 1982. By the time of the trial in *Harrison*, however, some employees at MarAd perceived Ms. Shetler to be an instigator or a ringleader of EEO activity at MarAd.

The plaintiff's case centers around the alleged animus toward her by Mr. Russell Stryker, associate administrator for policy and administration, who reported to Admiral Shear, administrator of MarAd. The plaintiff and other witnesses testified that Mr. Stryker was displeased with Ms. Shetler's EEO activities and about the *Harrison* litigation in general. He occasionally

---

1. During her employment at the Maritime Administration, the plaintiff was known as "Shetler" and she was referred to as "Shetler" during the trial. The Court will refer to her by this name in this memorandum.

2. MarAd was within the Department of Commerce until 1980, when it was moved to the Department of Transportation, of which it is now a part. The defendant is Secretary of the Department of Transportation.

made unfavorable comments about her to her supervisor and often mentioned her at weekly staff meetings during the *Harrison* litigation. The plaintiff testified that Mr. Stryker once referred to her as the "enemy" in a conversation with another MarAd employee.

The Office of Maritime Labor and Training, in which the plaintiff worked after 1977, analyzed long-term labor trends in the maritime industry, worked with the maritime labor unions, ran the U.S. Merchant Marine Academy, and operated other maritime labor programs. The plaintiff was a productive employee of the Office of Maritime Labor and Training.

MarAd was forced to make significant cutbacks in the number of its employees during the federal budget cuts of the early 1980s. For example, the agency was forced to cut the number of full time (or equivalent part-time) employees from 1249 in 1981 to 973 in 1984.

After consulting with Mr. Stryker, associate administrator for policy and administration, MarAd Administrator Admiral Shear ordered a "reduction in force" ("RIF") in 1982. He directed that much of the RIF be imposed on MarAd's Washington office and on the regional offices, in order to preserve as much as possible of the agency's shipbuilding, ready reserve fleet, and maritime subsidy activities.

Code 250 was ordered to reduce its staff from 13 to 12 employees. Admiral Shear ordered that the cut be made to coincide with the transfer of the agency's radar schools into private hands.

Mr. Friedberg decided that he would abolish Ms. Shetler's position, even though she had no responsibility for the radar schools. The positions of the three employees whose task it was to oversee the radar schools were not chosen for abolition. Mr. Friedberg stated that his decision was made because he concluded that the work Ms. Shetler was performing was of decreasing value to the agency.

The plaintiff testified that Mr. Friedberg, like Mr. Stryker, did not not approve of the *Harrison* litigation and made disparaging comments about the meetings of the *Har-*

*rison* participants. She did not testify, however, that she heard him criticize her personally about EEO activities.

Not long before the RIF was to go into effect, however, another Code 250 employee unexpectedly resigned. Mr. Friedberg cancelled the abolition of Ms. Shetler's position, even though he did not have to do so.

Because of tightening budget constraints, however, MarAd officials by early 1983 concluded that the agency needed to decrease the number of its employees to 993 by October 1983. MarAd had 1054 employees at the beginning of 1983.

The administrative and budget staff recommended another RIF to Mr. Stryker, who in turn sent a formal recommendation to Admiral Shear. In a memorandum of January 1983 to Admiral Shear, Mr. Stryker concluded that attrition probably would not lower the employment number from 1,054 to 993 by October 1983, and that a RIF would be needed.

The Court does not accept the notion that Mr. Stryker somehow forced the idea of an unnecessary RIF on Admiral Shear. While Admiral Shear has stated that he of course preferred lowering the employment level by work force attrition rather than by a RIF, it did not appear to the administrative staff, Mr. Stryker, or Admiral Shear in early 1983 that attrition would be sufficient. Admiral Shear also has stated that he preferred to abolish positions that were vacant whenever possible, instead of abolishing positions that were filled. As of early 1983, however, he believed that MarAd would have to abolish some occupied positions.

The 1983 RIF followed a pattern similar to the 1982 RIF. Once again, the regional offices and the Washington office suffered the deepest cuts, whereas the reserve fleet and Merchant Marine Academy work force escaped relatively unscathed.

Even though MarAd implemented a general hiring freeze in 1982 that continued until 1984, the agency made exceptions in hiring persons for some essential positions, such as technicians and mechanics of the reserve fleet. The agency in July and Oc-

tober 1983 requested adding 29 new employees and was given permission by the Department of Transportation to hire 14. The plaintiff argues that because the agency's records and the memories of MarAd officials are not clear as to how the agency considered the effect of these 29 potential hirees on the total work force of 993 employees, doubt must be cast on the validity of the decision to implement a RIF. The Court concludes, however, that the decision to request 29 new hires in July and August need not have been anticipated by MarAd officials in early 1983, when the decision to implement the RIF was made. Because of the uncertainties of attrition, emergencies, and other factors, an agency can never predict with certainty exactly how many employees it will have in the future, and thus it cannot tell with certainty how many employees it will have to dismiss in a RIF. Accordingly, the Court concludes that the uncertainty over whether the 29 potential hirees—of which only 14 were approved—were to be included in the total of 993 does not cause it to question the validity of decision to implement the RIF in the manner that it was implemented.

The head of the Office of Management and Organization, Mr. Mann, recommended to Mr. Stryker that Code 250 be cut by one employee. Mr. Stryker did not alter the recommendation with regard to Code 250, and forwarded it to Admiral Shear. At trial, Mr. Mann stated that there was no specific "programmatic" reason for the cut at Code 250. Rather, such a cut was "proportionate to the average," considering Admiral Shear's preferrence for making most of the cuts at the Washington and regional offices.

Admiral Shear made several changes to the proposed RIF. Again following his policy of trying to preserve certain programs of MarAd, Admiral Shear altered the RIF so that there would be fewer cuts at the maritime subsidy and shipbuilding programs. In return, once again, the regional offices and Washington office suffered the brunt of the cuts. For example, employment at Mr. Stryker's Office of Policy and Administration was to fall from 182 to 147.

The defendant also presented evidence that Admiral Shear himself made the decision to increase from one to two the number of persons in Code 250 to be laid off by the RIF. This change is reflected in a handwritten alteration to Mr. Stryker's proposal. Mr. Mann, Mr. Stryker, and Mike Myrtle each testified that it was Admiral Shear's handwriting; indeed, only Admiral Shear was authorized to make such a change. The Court concludes that the change was made by Admiral Shear's hand and that he, without Mr. Stryker's instigation, made the decision to increase the cut at Code 250 from one to two.

The Court rejects the plaintiff's contention that Mr. Stryker instigated either the RIF, the increase in Code 250's share of the RIF, or both, as a way of targeting Ms. Shetler for dismissal. The plaintiff does note correctly that a number of key personnel in the RIF decisionmaking process reported to Mr. Stryker—Mr. Mann, head of the Office of Management and Organization, Mr. Turanian, acting head of the Office of Personnel, and Mr. Earnest Hawkins, head of the agency's EEO office—and that Mr. Stryker essentially was their conduit to Admiral Shear.

The decision to cut two positions from Code 250 appears to have been a reasonable one. The Office of Maritime Labor and Training performed some work that was less than essential; a report from Mr. Friedberg a few months earlier predicted delays and the abandonment of certain projects but no dire consequences if there was to be a RIF of up to three employees of Code 250.

After being informed that he would have to cut two of his employees and after seeing his protests go unheeded, Mr. Friedberg was faced with the choice of whom to lay off in his office. In making his decision, Mr. Friedberg analyzed the functions of his office and his dozen employees. He determined that the job performed by Ms. Shetler, although useful, was the least essential of the positions.

Ms. Shetler worked in five broad areas, Mr. Friedberg concluded, three of which

occupied most of her time. First, she organized meetings concerning the Merchant Marine Academy Advisory Board and the Congressional Board of Visitors. Mr. Friedberg concluded that this function could be done by academy personnel. Second, Ms. Shetler monitored maritime labor legislation. This consisted primarily of following the proposed amendments to the Longshore and Harbor Workers' Compensation Act; after enactment of the amendments the responsibility for oversight was shifted away from the agency. Third, Ms. Shetler planned mobilization for the merchant marine fleet.

In addition to these three major functions, Ms. Shetler also performed *"ad hoc activities"*—such as revision of the federal maritime regulations—and made studies in the area of shipyard labor. Mr. Friedberg concluded that there would be less need for shipyard studies as the agency withdrew its support of shipyards and as the government phased out the construction differential subsidies that had been paid out to support American shipbuilding.

Because he determined that much of the functions that she had performed were no longer going to be necessary, Mr. Friedberg concluded that the job held by Ms. Shetler was the least essential of the positions at his office, and that abolition of the position would be the least disruptive to the work of the office and the agency. The Court concludes that the reasons offered by Mr. Friedberg for his decision to eliminate Ms. Shetler's position were bona fide.

The Court also determines that Mr. Friedberg did not eliminate Mr. Shetler's position in whole or in part because of animus arising out of her EEO activities.

The fact that Mr. Friedberg consistently rated Ms. Shetler highly as an employee during her six years at Code 250 is not strong evidence that his decision to lay her off in the 1983 RIF was the result of retaliation. Indeed, if Mr. Friedberg had wanted to retaliate against Ms. Shetler, who had performed a number of EEO activities by 1979, he could have done so through poor evaluations. Rather, Mr. Friedberg's actions were more consistent

with a supervisor who found Ms. Shetler a productive employee but who determined that her position was the least essential at Code 250.

In addition, Mr. Friedberg's discussions with the plaintiff before 1983 regarding the vulnerability of her position to a RIF are more consistent with their express purpose—to have the plaintiff's job restructured in order to minimize her exposure to a RIF—than with the suggestion that Mr. Friedberg had pre-selected Ms. Shetler for a RIF or wanted to remove some aspects of her job. Ms. Shetler did not want to be reassigned to any of the other positions in the office that Mr. Friedberg suggested; accordingly, Mr. Friedberg did not change Ms. Shetler's job description.

The Court also rejects the suggestion that Mr. Friedberg showed retaliatory intent by his failure to lay off in 1982 any off the three male employees who worked with the radar schools, which were being privatized. Mr. Friedberg concluded that the privatization would result in more work for his office in the short run. In any event, it is also worth noting that Ms. Shetler was not laid off in the 1982 RIF; when another employee resigned, Mr. Friedberg contacted the personnel office and told it to cancel the RIF notice to Ms. Shetler, something that he did not have to do and something that he could have done if he truly harbored a desire to lay off Ms. Shetler because of her EEO activities.

In addition, the plaintiff contends that the defendant showed relatiatory intent in 1983 by failing to offer Ms. Shetler a GS–6 typing job in lieu of dismissing her entirely. She notes that her government job application stated that she was fairly proficient at typing. Under civil service rules, the defendant did not have to offer her the typing job. The plaintiff argues that if her supervisors did not have retaliatory intent, they would have offered her the typing position. The Court disagrees, noting the obvious managerial problems that would likely arise if an employer were to demote a high-level employee to a typing job. It is also worth noting that Ms. Shetler was offered a typing position when it appeared

that her job would be abolished in the 1982 RIF—action that would appear inconsistent with the contention that the 1982 RIF was the defendant's first attempt to remove Ms. Shetler.

Furthermore, the plaintiff contends that the defendant showed retaliatory intent by failing to have Ms. Shetler "bump" another employee. Instead, the position of the one employee that the plaintiff could have "bumped" also was abolished in the 1983 RIF. The plaintiff suggests that this was done in order to avoid having Ms. Shetler take the position. The Court concludes, however, that there is no reason to believe that the action was taken for a reason other than the one stated by the defendant—that the position was chosen for abolition because it was more expendable than other positions.

Finally, the Court concludes that Mr. Friedberg's personnel decisions after the plaintiff was laid off in the 1983 RIF do not show that he had purposely targeted Ms. Shetler for the RIF. For example, the plaintiff maintains that Mr. Friedberg gave preferential treatment to Mike Ercole, who had no involvement in EEO litigation and who also was designated for separation through the RIF. The Court concludes, however, that Mr. Ercole was not separated until after the plaintiff because of his veteran's preference status.

*II. Conclusions of Law*

■ Claims of unlawful retaliation against an employer for protected antidiscrimination activity, pursuant to section 704(a) of the Civil Rights Act of 1964 (codified at 42 U.S.C. § 2000e–3(a)), follow the same framework as more traditional Title VII claims. *McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C.Cir.1984) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), which set forth the framework for proving a Title VII claim). A plaintiff must first establish a *prima facie* case of retaliation by showing: (1) that she engaged in protected activity; (2) that the employer took adverse action against her; and (3) that there is at least an inference of a causal connection between the two. *McKenna*, 729 F.2d at 790. An activity is protected if it involves opposing alleged discriminatory treatment by the employer or particpating in legal efforts against the alleged treatment. 42 U.S.C. § 2000e–3(a). A *prima facie* case, which traditionally is fairly easy to establish in a Title VII case, may be made in a retaliation case merely through circumstantial evidence that an adverse employment action was taken against the plaintiff not long after she participated in protected activity. *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C.Cir.1985).

■ Once a *prima facie* case has been made out, the burden shifts to the defendant to articulate a legitimate, nonretaliatory reason for the adverse employment action. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254–55, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981). If this is done, the plaintiff may then try to prove that the articulated reason was actually a pretext for unlawful retaliation. *Chen v. GAO*, 821 F.2d 732 (D.C.Cir.1987). The ultimate burden of persuasion in proving retaliation remains with plaintiff. *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

■ A plaintiff may also prevail in a Title VII case by using new frameworks of proof developed by courts in recent years to supplement the traditional *McDonnell Douglas* path. First, a plaintiff may prevail if she fully discredits the defendant's stated nonretaliatory reason, even without showing any direct evidence of discrimination. *King v. Palmer*, 778 F.2d 878, 881 (D.C.Cir.1986). Second, when a plaintiff has established that the defendant's decision was based in part on an improper motivation and in part on a legitimate reason, the employer has the burden of proving "that its legitimate reason, standing alone, would have induced it to make the same decision." *Price Waterhouse v. Hopkins*, —— U.S. ——, 109 S.Ct. 1775, 1792, 104 L.Ed.2d 268 (1989) (Brennan, J.). The employer may prevail if it convinces the Court of this fact by a preponderance of the evidence. *Id.* In *Price Waterhouse*, one justice wrote that when the plaintiff

has established the existence of an improper motivation, the Court should state whether its analysis then proceeds under the *McDonnell Douglas* or the *Price Waterhouse* framework. *Id.* 109 S.Ct. at 1805. (O'Connor, J., concurring).

■ In the instant case, the Court concludes that the plaintiff succeeded in making out a *prima facie* case of retaliation. Although the defendant points out that it was nearly two years between the plaintiff's last overt activity in the *Harrison* litigation and her separation, *see, e.g., Clark v. Chrysler Corp.*, 673 F.2d 921, 930 (7th Cir.) (two years between protected activity and adverse action is too long to establish a *prima facie* case of retaliation), *cert. denied*, 459 U.S. 873, 103 S.Ct. 161, 74 L.Ed.2d 134 (1982), the Court believes that the two-year period is a slightly misleading figure in this case. Although the last time the plaintiff participated in *Harrison* was by giving a deposition in June 1981, she was on the list of possible defense witnesses in late 1981. Moreover, because *Harrison* did not go to trial until early 1982, it would be reasonable to assume that any animosity kindled by the litigation would not abate until well into 1982. Finally, it is notable that the plaintiff was first told that she would be laid off in the 1982 RIF only a few months after the trial in *Harrison*, even though this notification was later cancelled. Because the date of the first RIF certainly was close enough to make out a *prima facie* case of retalition, the Court believes that the fact the plaintiff was laid off in the *next* RIF also is enough to establish a *prima facie* case.

Moreover, even if the plaintiff's discussions with the active members of the *Harrison* litigation were not protected activity—and the Court does not need to decide whether they were—the fact that the plaintiff maintained contact with these employees makes it more reasonable to infer the possibility of retaliation against her in 1983.

Finally, the plaintiff helps prove a *prima facie* case of discrimination by citing negative comments by Mr. Stryker and Mr. Friedberg regarding EEO activities. Although the officials did not take any adverse action against the plaintiff when they made the comments, the statements themselves help connect the plaintiff's EEO activity and her dismissal enough to help establish a *prima facie* case.

■ The Court also concludes, however, that the defendant articulated legitimate, nonretaliatory reasons for dismissing Ms. Shetler in the 1983 RIF and that the plaintiff failed to prove that these reasons were pretextual. In doing so, the Court notes that it uses the traditional *McDonnell Douglas* framework, instead of the *Price Waterhouse* path. *See Price Waterhouse*, 109 S.Ct. at 1805 (O'Connor, J., concurring) (stating when a court should use each framework). It does so because the plaintiff, in the Court's opinion, failed to prove that the defendant had a "dual motive"— retaliation and a valid reason—for taking adverse action against the plaintiff. The conclusion that the plaintiff has met the relatively low burden of making out a *prima facie* case of retaliation by establishing an inference of retaliation is *not* the same as establishing that the defendant actually had a retaliatory motive in dismissing the plaintiff. In the instant case, the agency provided solid nonretaliatory reasons for the actions that it took, and the plaintiff failed to convince the Court that these reasons were pretextual, or even that retaliation was part of the agency's reasons for taking action against the plaintiff.

As stated in the findings of fact, the Court rejects the plaintiff's allegations that either Mr. Stryker or Mr. Friedberg manipulated the RIF process in order to have Ms. Shetler dismissed. While it is true that Mr. Stryker and Mr. Friedberg expressed displeasure by EEO work and disagreed with Ms. Shetler over whether she was spending too much time on EEO activities, this fact does not overcome the showing by the defendant that the decisions to implement the RIF and to abolish Ms. Shetler's position were made for sound administrative and personnel reasons. As stated in the findings of fact, the Court is convinced that the nonrelatiatory reasons given for the dismis-

sal of Ms. Shetler were the true and only reasons for her dismissal.

The agency decided to implement the 1983 RIF because of the requirement of personnel cuts and the reasonable prediction that attrition would not lower the number of employees to the level that the agency wanted in 1983. The recommendation of a RIF originated below Mr. Stryker and was approved by Admiral Shear. The plaintiff has failed to convince the Court that the RIF was urged by Mr. Stryker as a way of getting to Ms. Shetler. The plaintiff failed to discredit the stated reason for the RIF, failed to prove that it was pretextual, and failed to prove that the agency's decisionmakers took into account retaliatory motives at all in deciding to implement the RIF. The plaintiff did show that the agency did not necessarily take into account in its calculations the fact that it would seek approval for 29 new emergency hires in 1983. This fact does not, however, discredit the reasons for the RIF, establish that they were pretextual, or prove that they were motivated even in part by a retaliatory motive.

In addition, the Court concludes that the agency showed valid reasons for the decision to dismiss employees from the plaintiff's office. While the plaintiff showed that the agency had no "programmatic" reason for making cuts in the Code 250 office, the Court notes that an agency cannot be required to have a specific reason for cuts at *each* office during an agency-wide RIF. The fact that an agency-wide cut is desired is, almost by definition, enough. It is clear that Admiral Shear wanted the cuts to fall primarily on the regional and Washington offices. It is also clear that the cuts suffered by Code 250 were not extraordinary; indeed, they were less severe than those suffered by other offices. Finally, it is clear that the handwritten increase in the number of cuts at Code 250 from one to two was made in Admiral Shear's hand; there is no evidence that Mr. Stryker pushed for this change to his own proposal. In sum, the plaintiff failed to discredit the defendant's reasons for the cuts to Code 250, failed to prove that they were pretextual, and failed to prove that the agency was motivated even in part by a retaliatory motive.

Finally, the Court concludes that the agency established a solid and undiscredited rationale for the decision to abolish the plaintiff's position in the RIF. Mr. Friedberg concluded that, although the plaintiff was a valued worker, most of her job functions either could be done by other persons or were decreasing in importance as MarAd's functions changed. The plaintiff again failed to prove that these stated reasons were not the true ones. The Court's conclusion is not swayed by the fact that the plaintiff, a high-level official at the time, was not offered a GS–6 typing position, nor by the fact that the one position occupied by an employee that the plaintiff was entitled to "bump" also was abolished. Again, the Court does not believe that the plaintiff either discredited the stated reason for the decision to abolish the plaintiff's position, proved that the stated reason was pretextual, or that the agency was motivated even in part by retaliatory motives.

■ In conclusion, the Court notes that when a plaintiff establishes in a retaliation case that her supervisors at one time expressed animosity toward her EEO activities, the Court must examine with the closest scrutiny the employer's stated reasons for the adverse action taken against the employee. On the other hand, when the employer has compelling nonretaliatory reasons, the plaintiff cannot shield herself from adverse action merely because of the earlier expressions of animosity. In the instant case, the plaintiff failed to prove that Mr. Stryker conjured up a RIF in the hope that Ms. Shetler would be dismissed, or that Mr. Friedberg used the opportunity of the RIF to fulfill a retaliatory urge by abolishing Ms. Shetler's position, or that Mr. Stryker and Mr. Friedberg conspired to eliminate the plaintiff's job. The Court concludes that the agency proved that its actions were taken because of legitimate, nonrelatiory reasons. The Court finds no liability under Title VII.

JUDGMENT ORDER

In accordance with the memorandum filed on this date, judgment is entered in favor of the defendant.